UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FLORENCE APLIN, by her Agent, JUDY ROBINSON,

                    Plaintiff,

                                     DECISION AND ORDER

v.

                                     Case No. 12-CV-6312FPG

M. JOSH MCCROSSEN, Commissioner,
Wayne County Department of Social Services,
HOWARD ZUCKER, Acting Commissioner,
New York State Department of Health, and
KRISTIN M. PROUD, Commissioner,
New York State Office of Temporary and
Disability Assistance,

                             Defendants.[1]

---

SERGIO CIARDI, by his Agent, CARL QUANCE,

                    Plaintiff,

                                     DECISION AND ORDER

v.

                                     Case No. 13-CV-6388FPG

EILEEN TIBERIO, Commissioner,
Ontario County Department of Social Services, and
HOWARD ZUCKER, Acting Commissioner,
New York State Department of Health,

                             Defendants.[2]

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Howard Zucker, Acting Commissioner of the New York State Department of Health, is automatically substituted for the named Defendant Nirav R. Shah, M.D., former Commissioner of the New York State Department of Health, and Kristen M. Proud, Commissioner of the New York State Office of Temporary and Disability Assistance, is automatically substituted for the Names Defendant Elizabeth R. Berlin, former Executive Deputy Commissioner of the New York State Office of Temporary and Disability Assistance, in Case # 12-CV-6312. The Clerk of the Court has amended the caption, accordingly.

[2] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Howard Zucker, Acting Commissioner of the New York State Department of Health, is automatically substituted for the named Defendant Nirav R. Shah, M.D., former Commissioner of the New York State Department of Health, in Case # 13-CV-6388.  The Clerk of the Court has amended the caption, accordingly.

## I.      **INTRODUCTION**

These two cases are before the Court for resolution of a common legal issue raised by both Plaintiffs, nursing home residents who essentially contend that the local County Departments of Social Services miscalculated their eligibility dates for Medicaid coverage of their nursing home care following the return of some of the assets which were transferred for less than market value during the statutorily prescribed 60-month look-back period.[3]   Both Plaintiffs assert that in contravention of federal Medicaid law, to arrive at these eligibility decisions, the County Defendants applied New York State Department of Health ("DOH") Administrative Directive 06 OMM/ADM-5, pp.18-19 ("AD 06 OMM/ADM-5, pp.18-19"), a policy which the County and State Defendants contend was put in place to implement changes in federal Medicaid law. Plaintiffs further contend that relief for these violations may be had under 42 U.S.C. § 1983 and the Supremacy Clause.   For the reasons set forth herein below, I find the Defendants' interpretation and application of AD 06 OMM/ADM-5, pp.18-19 to be consistent with the federal Medicaid statutes, and the injunctive and declaratory relief requested by these Plaintiffs, respectively, should be denied and Defendants' motions for summary judgment dismissing the Complaints[4] should be granted.

## II.     **FACTUAL BACKGROUND**

Although the legal posture and procedural history of each of these cases differs, all parties agree that no factual disputes exist for trial, and they are seeking a determination of the following purely legal question: **When an uncompensated transfer of assets has been made and a penalty period imposed, how does a partial return of the transferred funds affect the beginning of the penalty period?** Before turning to this question, a review of the agreed-upon

---

[3] The determination regarding Plaintiff Aplin was upheld after the conduct of a requested Fair Hearing.
[4] See discussion of the parties' motions set forth herein below.

undisputed facts as they relate to the individual circumstances of each Plaintiff, and the procedural history of each case, as set forth in the parties' filed pleadings, motion papers and supporting documentation, motion responses and replies thereto, and statements of undisputed facts, proves helpful.

### A.  Undisputed Facts of Plaintiff Aplin's Case

On December 27, 2007, an application for medical assistance ("Medicaid") was submitted on behalf of then-80-year-old Florence Aplin ("Plaintiff Aplin") who had been admitted on June 28, 2007 to a Residential Health Care Facility ("nursing home") located within the Western District of New York.   Upon review, the Medicaid application revealed that Plaintiff Aplin had uncompensated transfers of assets totaling $379,957.90 for the period August 2006 through November 2007.   On February 28, 2008, the Wayne County Department of Social Services ("WCDSS") determined that based upon these uncompensated transfers, Plaintiff Aplin was ineligible for Medicaid assistance for nursing home care for 47.48 months, *i.e.*, November 1, 2007 through September 2011, with a remainder contribution due for the penalty fractional month of October 2011.  No Fair Hearing was requested on Plaintiff Aplin's behalf to contest the determination made by WCDSS on February 28, 2008.

Thereafter, by letter dated November 19, 2009, Plaintiff Aplin's attorney notified WCDSS of additional post-eligibility transactions affecting the transfer penalty period determination of February 28, 2008, specifically stating that Plaintiff Aplin had additional uncompensated transfers totaling $70,004.30 during the period October 2008 through September 2009, which were not reflected in the original transfer penalty calculation.  Plaintiff Aplin's attorney further indicated that $124,500.00 of the originally transferred assets had been returned post-eligibility during March 2008 through November 2009, with an additional anticipated return of $56,000.00 in assets by June 30, 2010.  Per her attorney's representations, the total anticipated return of assets amounted to $176,771.00.

On December 22, 2009, Plaintiff Aplin re-applied for Medicaid. Based upon the revised documentation submitted on Plaintiff's behalf, WCDSS recalculated the original transferred assets, increasing the original penalty transfer of $379,957.90 by $70,082.41 to $450,039.31. WCDSS further determined that after the initial eligibility period, specifically during the period of October 2008 through June 2009, additional assets totaling $76,872.44 had been transferred for no compensation, bringing the total amount of the uncompensated transfers to $526,911.75, and that after the initial eligibility determination, $153,811.40 in assets had been returned during the period of April 2008 through June 2009. Offsetting the additional transfers against the returned assets, WCDSS lowered the recalculated transfer amount from $450,039.31 by $76,938.96 to arrive at a reduced transfer amount of $373,100.35.

Utilizing the policy articulated in AD 06 OMM/ADM-5, pp. 18-19, WCDSS added the returned assets of $153,811.40 to Plaintiff Aplin's resources as of the original eligibility date of November 1, 2007, and determined that Plaintiff's actual nursing home costs for the period November 1, 2007 through June 2009 totaled $153,149.73, thereby delaying the recalculated transfer penalty period until July 2009. On June 16, 2011, WCDSS advised Plaintiff Aplin that she was ineligible for nursing home care and services for a period of 46.63 months, commencing July 2009 and running through April 2013, with a remainder contribution in May 2013. WCDSS arrived at the ineligibility determination of 46.63 months by dividing $373,100.35, the recalculated uncompensated value of transferred assets, by $8002.00, the monthly regional rate for nursing home care services, with a remainder contribution of $5008.30 in May 2013. The net reduction in the amount of uncompensated transfers due to the return of $153,811.40 in assets resulted in the penalty period being reduced from 47.48 to 46.63 months.

Plaintiff Aplin requested a Fair Hearing pursuant to Section 22 of the New York Social Services Law ("N.Y. Soc. Serv. Law") and Title 18, Part 358 of the New York Codes, Rules and Regulations ("N.Y.C.R.R."), which hearing commenced before a New York State Office of

Temporary and Disability Assistance ("OTDA") Administrative Law Judge in Wayne County on September 8, 2011 and concluded on November 14, 2011. The sole issue to be decided at the Fair Hearing was the correctness of the June 16, 2011 determination by WCDSS that Plaintiff Aplin was ineligible for Medicaid for nursing facility services for a period of 46.63 months commencing July 1, 2009 and ending April 2013, with a remainder contribution in May 2013 because of transferred assets for less than fair market value.

Thereafter, on January 23, 2012, after conducting a full review of the record and evidence presented and citing the applicability of AD 06 OMM/ADM-5, pp. 18-19 and the pertinent law, the OTDA Administrative Law Judge issued its Decision after Fair Hearing No. 5862379N, affirming the WCDSS determination that Plaintiff-Appellant Aplin was not eligible for Medicaid for nursing facility services for a period of 46.63 months, commencing on July 1, 2009 and ending April 2013, with a remainder in May 2013, because of assets transferred for less than fair market value.

### B. Procedural History of Plaintiff Aplin's Case

Subsequently, following issuance of the Decision after Fair Hearing, Plaintiff Aplin, now 84 years old, by her agent, Judy Robinson ("Agent Robinson"), brought this action against M. Josh McCrossen, Commissioner, WCDSS ("Defendant McCrossen"); Howard Zucker, Acting Commissioner DOH ("DOH Defendant"); and Kristin M. Proud, Commissioner, OTDA ("OTDA Defendant"), alleging the above-referenced facts and seeking "injunctive and declaratory relief to require the Defendants to recompute her 'penalty period' of ineligibility for medical assistance ('Medicaid')" for nursing home care. ECF No. 2. By her Amended Complaint, Plaintiff Aplin alleged that after an initial determination of ineligibility had been made by WCDSS, due to an uncompensated transfer of assets, some of the transferred assets were returned, but WCDSS erroneously recomputed the penalty period of ineligibility as having

commenced on a later date, July 1, 2009, rather than starting on November 1, 2007, the date of the original penalty period. *Id.*

The Amended Complaint set forth two statements of claim alleging, respectively, separate violations of (1) 42 U.S.C. §§ 1396a(a)(18) and 1396p(c)(1)(A) and (D)(ii); and (2) 42 U.S.C. § 1396a(a)(17)(B), and alleging as to each statement of claim that relief is appropriately available pursuant to 42 U.S.C. § 1983 and the Supremacy Clause. *Id.* As relief, Plaintiff Aplin sought a judgment (1) declaring the WCDSS decision null and void, enjoining Defendant McCrossen to require WCDSS to recompute her Medicaid eligibility using the correct penalty period start date of November 1, 2007; and ordering Defendant McCrossen to require WCDSS to provide Medicaid coverage for her nursing home care at the expiration of the correct penalty period start date of November 1, 2007, (2) declaring the provisions of AD 06 OMM/ADM-5, pp.18-19, requiring recalculation of the penalty period based on a partial return of transferred assets, to be null and void, and enjoining the DOH and OTDA Defendants from applying them to her by DOH and the OTDA; and (3) declaring the Decision after Fair Hearing No. 5862379N to be illegal, null and void, enjoining all Defendants from following or implementing it and enjoining the DOH and OTDA Defendants to cause DOH and OTDA to correct the Decision after Fair Hearing to reflect November 1, 2007 as the lawful penalty period start date. *Id.*

At this juncture, pending before the Court for determination are Plaintiff Aplin's and the DOH and OTDA Defendants' cross motions seeking summary judgment.[5]   Defendant McCrossen has joined in the DOH and OTDA Defendants' summary judgment motion and opposes Plaintiff Aplin's request for motion relief ("McCrossen Motion") (ECF No. 24).   All motions have been fully briefed and the parties' responses and replies, if any, have been considered in determining these cross motions.

---

[5] The cross motions are Plaintiff Aplin's Motion for Summary Judgment (ECF No. 18) ("Pl. Aplin's Motion") and the Motion for Summary Judgment or Dismissal filed on behalf of the DOH and OTDA Defendants (ECF No. 22) ("Defs. DOH and OTDA's Motion").

### C. Undisputed Facts of Plaintiff Ciardi's Case

Sergio Ciardi ("Plaintiff Ciardi"), an 85-year-old resident of a skilled nursing facility in Geneva, New York, within the Western District of New York, first applied for Medicaid coverage of his nursing home care on February 26, 2010. However, after an investigation of the application, Ontario County Department of Social Services ("OCDSS") determined that in 2007 and 2008, during the 60-month look-back period, Plaintiff Ciardi had made less than market value money transfers totaling over $470,000, which rendered him ineligible to receive Medicaid benefits. A Fair Hearing date was scheduled, but following Plaintiff Ciardi's withdrawal of his request for a Fair Hearing, a Notice of Decision was sent in early December 2010, informing him that based upon these transfers, a penalty period of 51.9 months from the eligibility date of January 1, 2010, until March 1, 2014, was imposed with a remainder contribution due in April 2014. OCDSS closed the case almost a year later because Plaintiff Ciardi failed to provide necessary supportive documentation for receipt of benefits.

On March 29, 2012, Plaintiff Ciardi re-applied for Medicaid benefits, asserting that because $293,167 of the more than $470,000 in transferred assets had been repaid to him, the transfer total was reduced to $176,865, and the penalty period should be retroactively reduced to 19.53 months, thereby ending on February 24, 2012. Plaintiff Ciardi subsequently supplied documentation to OCDSS which reflected that only $36,857.16 had been repaid to him, and on this basis, OCDSS recalculated the penalty period to be 47.83 months, until November 1, 2013, with a remainder contribution due in December 2013.

Thereafter, in April 2013, Plaintiff Ciardi provided to OCDSS appropriate documentation demonstrating that a total of $167,147.21 had been repaid to him, thereby, reducing the less than market value transfers to $302,885.75.[6] Because OCDSS determined that Plaintiff Ciardi would

---

[6] OCDSS has acknowledged its error in calculating the total less than market value transfers as $298,714, instead of $302,885.75, as pointed out by Defendants DOH and OTDA. According to OCDSS, this error notwithstanding, the penalty period still expires in March of 2014.

not become eligible until he spent down to New York State's $14,400 maximum Medicaid resource level to qualify for Medicaid nursing home benefits, it set a new eligibility date of August 1, 2011 and started the penalty period as of this date.   In June 2013, Plaintiff Ciardi contested the recalculation of his eligibility date to August 1, 2011, relying upon a letter dated October 28, 2010, written by Richard R. McGreal ("McGreal"), Associate Regional Director of the Center for Medicaid Services in Boston, Massachusetts, which provided "informal written interpretive guidance" to Michael P. Starkowski ("Starkowski"), Commissioner, Department of Social Services, regarding Connecticut's "treatment of partial returns with the respect to the application of a penalty period for a disqualifying transfer of assets pursuant to § 1917 of the Social Security Act." (ECF No. 1, Ex. 3).   OCDSS took the position that when determining Plaintiff Ciardi's eligibility for nursing facility services and the appropriate penalty period for uncompensated asset transfers, it was governed by the AD 06 OMM/ADM-5, pp.18-19.  Plaintiff Ciardi filed a request for a Fair Hearing, but later withdrew it.

### D. Procedural History of Plaintiff Ciardi's Case

Following the filing and later withdrawal of his request for a Fair Hearing, Plaintiff Ciardi, by his agent Carl Quance ("Agent Quance"), commenced this action against Defendant Eileen Tiberio, Commissioner, OCDSS ("Defendant Tiberio"), and the DOH Defendant, challenging the decision by OCDSS and the policy of the DOH that, "after an initial determination had been made that Plaintiff was ineligible for medical assistance ('Medicaid') due to an uncompensated transfer of assets, but some of those assets had been returned, when his penalty period of ineligibility from those transfers was recomputed, the penalty period was not started on the same date as the original penalty period but rather was started on a later date." ECF No. 1.  The Complaint set forth two statements of claim alleging, respectively, separate violations of (1) 42 U.S.C. §§ 1396a(a)(18) and 1396p(c)(1)(A) and (D)(ii); and (2) 42 U.S.C. § 1396a(a)(17)(B), and alleging as to each statement of claim, that relief is appropriately available pursuant to 42

U.S.C. § 1983 and the Supremacy Clause. *Id.* By his Complaint, Plaintiff Ciardi sought a judgment (1) declaring the OCDSS decision null and void, enjoining Defendant Tiberio to require OCDSS to recompute his Medicaid eligibility using the correct penalty period start date, and ordering Defendant Tiberio to require OCDSS to provide Medicaid coverage for his nursing home care at the expiration of the correct penalty period; and (2) declaring the provisions of AD 06 OMM/ADM-5, pp.18-19, to be null and void, and enjoining the DOH Defendant from applying them to him by DOH.

Now, before the Court is Plaintiff Ciardi's Motion for Preliminary Injunction (ECF No. 8) filed pursuant to Fed. R. Civ. P. 65(a), seeking the following injunctive relief: (1) ordering Defendant Eileen Tiberio to cause OCDSS to recompute his Medicaid eligibility date to be effective as of October 1, 2012 on the ground that OCDSS erroneously determined that the 32.97 month penalty period of Medicaid eligibility for his nursing home care due to uncompensated transfers of assets began on August 1, 2011, which OCDSS computed to account for the partial return of gifts that resulted in that penalty period, rather than on January 1, 2010, the date he was eligible for Medicaid other than nursing home services, in violation of 42 U.S.C. §§ 1396a(a)(18), 1396p(c)(1)(A)and D(ii) and 1396a(a)(17)(B); and (2) ordering the DOH Defendant to require DOH to cease applying to him the provisions of Administrative Directive 06 OMM/ADM-5, pp.18-19, pursuant to which the OCDSS determination was made, regarding the start date of a penalty period after transferred assets have been partially returned. Plaintiff Ciardi submitted Plaintiff's Memorandum of Law in Support of Motion for Preliminary Injunction[7] ("Pl. Ciardi's Mem.") (ECF No. 8-2), wherein he stated: no testimony will be required before a decision on the preliminary injunction motion and "[s]ince there are no disputed material facts, and the motion solely concerns questions of law, the court may treat this

---

[7] Plaintiff Ciardi attached Agent Quance's Affidavit in Support of Motion for Preliminary Injunction of ("Quance Aff.") (ECF No. 8-1).

motion as one for summary judgment" in like manner as the pending cross motions in *Aplin v. McCrossen*. Pl. Ciardi's. Mem. 1-2, ECF No. 8-2.

Defendant Tiberio and the DOH Defendant have each submitted a Memorandum in Opposition to the requested injunctive relief (ECF No. 13; ECF No. 14), as well as supporting affidavits.[8]   Replying thereto, Plaintiff Ciardi submitted Plaintiff's Reply Memorandum in Support of Motion for Preliminary Injunction[9] (Pl. Ciardi's Reply Mem.) (ECF No. 17).

Also pending for determination are Defendants' motions filed subsequent to the full briefing of Plaintiff Ciardi's preliminary injunction motion, namely, Defendant Tiberio's Motion to Dismiss for Failure to State a Claim pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 20), and the DOH Defendant's Motion for Summary Judgment referencing the documentation submitted in the related case, *Alpin v. McCrossen,* and contending that no genuine issues exist for trial (ECF No. 21).  In his opposition to both motions, Plaintiff Ciardi voiced his intentions to rely on the prior briefing of the preliminary injunction motion and, like the DOH Defendant, to reference the summary judgment briefs filed in *Alpin v. McCrossen*. ECF No. 24.  Additionally, asserting his agreement with the DOH Defendant's position that the action is ripe for summary judgment, Plaintiff Ciardi proposed to have the Court convert Defendant Tiberio's 12(b)(6) motion to dismiss to a motion for summary judgment pursuant to Fed. R. Civ. P. 12(d), alleging it includes

---

[8] Defendant Tiberio included the affidavits of Kristen J. Thorsness, Assistant County Attorney for Ontario County ("Thorsness Aff.") (ECF No. 13-1); Jacqueline Mangiarella, OCDSS Chronic Care Social Welfare Examiner ("Mangiarella Aff.") (ECF Nos. 13-2 and 13-3); and Patricia Sheppard, Senior Attorney in the DOH Bureau of Health and Insurance Programs ("Sheppard Aff.") (ECF No. 13-4).   Defendant DOH, attached the Affidavit Declaration of Eileen Brennan, Medicaid Specialist in the DOH Division of Health Reform and Health Insurance Exchange Integration ("Brennan Aff. Decl.") (ECF No. 14-1).

[9] Plaintiff Ciardi attached the Declaration in Support of Motion for Preliminary Injunction of Barbara J. Leaf, an Advocate at Eldernet ("Leaf Declaration"). ECF No. 17-1. On the same date, Defendant Tiberio filed Eileen Tiberio's Objection to Leaf Declaration, arguing that the Court should disregard a chart attached thereto as unauthenticated and inadmissible hearsay under Federal Rules of Evidence 602 and 802. ECF No. 18. Plaintiff Ciardi promptly filed his Letter Response to Defendant Tiberio's Objection to Leaf Declaration, stating that had Defendant Tiberio included as part of Ex. 11, which is an attachment to the Mangiarella Affidavit, the disputed chart and documentation submitted to Ms. Mangiarella, the OCDSS eligibility worker, as supporting the return of $167,147.21 to Plaintiff Ciardi, no dispute would have arisen. ECF No. 19.

material outside the Complaint. *Id.* All motions have been fully briefed and the parties' responses and replies, if any, have been considered in determining these motions.

## III.   DISCUSSION

### A.  Proper Legal Standard

Before proceeding further, some discussion of the proper legal standard to be utilized in assessing the legal question presented in this case is necessary. First, I accept Plaintiff Ciardi's invitation to treat his motion for a preliminary injunction as one for summary judgment (Fed. R. Civ. P. 56) in like manner as the pending cross motions in *Aplin v. McCrossen*, given that no testimony is required, there are no disputed material facts, and the motion solely concerns a question of law.

Next, the Court must consider whether to convert Defendant Tiberio's Rule 12(b)(6) motion to one for summary judgment, as Plaintiff Ciardi has proposed, based upon her requests: first, to have the Court consider the attached Mangiarella Declaration (ECF. No. 20-3), including its four exhibits consisting of true and correct copies of AD 06 OMM/ADM-5 dated July 20, 2006, in its entirety, including Appendix I (Listing of Attachments and attached forms); Plaintiff Ciardi's applications for Medicaid benefits dated, respectively, February 26, 2010 and March 29, 2012, and correspondence regarding these applications; and the cover page and the complete language of § 3258.10(c)(3) of the HHS/CMS State Medicaid Manual; and second, to take judicial notice of the New York State plan provisions assessing penalty periods as a result of less than fair market transfers during the look-back period by Medicaid applicants, an attachment to the Sheppard Aff. Ex. 1 (ECF No. 13-4). Viewing these documents as matters outside his Complaint, Plaintiff Ciardi has asserted that conversion is appropriate.

I look to the Second Circuit's guidance to district courts upon the presentation of requests to look at matters outside the pleading on a motion to dismiss:

> [When] considering a motion under Fed.R.Civ.P. 12(b)(6) to dismiss a complaint for failure to state a claim on which relief can be granted, the district court is normally required to look only to the allegations on the face of the complaint. If, on such a motion, matters outside the pleading are presented to and not excluded by the court, the court should normally treat the motion as one for summary judgment pursuant to Fed. R. Civ. P. 56. In any event, a ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact.
>
> In certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6). Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered. In addition, even if not attached or incorporated by reference, a document upon which the complaint solely relies and which is integral to the complaint may be considered by the court in ruling on such a motion.

*See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (citations and internal quotation marks omitted); *Peone v. County of Ontario*, 12-CV-6012 CJS, 2013 U.S. Dist. LEXIS 27698, at *2 (W.D.N.Y. Feb. 26, 2013). None of the documents specified by Defendant Tiberio is attached to the Complaint. I do not find them to be incorporated by reference or solely relied on in and integral to the Complaint.

Rule 12(d) addresses the presentation of matters outside the pleadings and specifies a notice requirement:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d); *Sahu v. Union Carbide Corp.*, 548 F.3d 59 (2d Cir. 2008) ("When a district court converts a motion to dismiss into one for summary judgment, '[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.' Fed.R.Civ.P. 12(d). Ordinarily, this means that a district court 'must give notice to the parties *before* converting a motion to dismiss pursuant to Rule 12(b)(6) into one for summary judgment and considering matters outside the pleading.'") (quoting *Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999) (citing *Kopec v. Coughlin*, 922 F.2d 152, 154–55 (2d Cir. 1991)) (emphasis

supplied)).  Fundamental to this notice requirement is "the principle that parties are entitled to a reasonable opportunity to present material pertinent to a summary judgment motion." *Id.*

> Compliance with these requirements . . .is not an end in itself.  The district court's conversion of a Rule 12(b)(6) motion into one for summary judgment is governed by principles of substance rather than form.  The essential inquiry is whether the appellant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings. Resolution of this issue will necessarily depend largely on the facts and circumstances of each case.

*Id.* (citing *In re G. & A. Books, Inc.,* 770 F.2d 288, 295 (2d Cir. 1985), *cert. denied,* 475 U.S. 1015 (1986)).  Assessing the facts and circumstances of this case, which included a review of the Complaint and the documents comprising Defendant Tiberio's requests for consideration of the Mangiarella Declaration and for judicial notice of the State plan, the Court surmises that Defendant Tiberio should reasonably have recognized the possibility that the motion to dismiss might be converted into one for summary judgment and was not taken by surprise or deprived of a reasonable opportunity to meet facts outside the pleadings.  Moreover, only a legal question is presented.  In such circumstances, formal notice is not required.  *Villante v. Dep't of Corrections of City of New York*, 786 F.2d 516, 521 (2d Cir. 1986); *Gomez v. City of White Plains*, 13-CV7750 (NSR) 2014 U.S. Dist. LEXIS 71802 (S.D.N.Y. May 23, 2014).  Defendant Tiberio's Motion to Dismiss is hereby converted to a motion for summary judgment and, in view of the commonality of the legal issues, will be considered together with and in like manner as the cross motions submitted in *Alpin v. McCrossen* and the now-converted summary judgment motion in *Ciardi v. Tiberio.*

## B.  Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Gonzalez v.*

*City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) ("Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.") (citation omitted).   The burden is on the moving party to establish the absence of any material factual issues.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   A court assessing a motion for summary judgment is "required to resolve all ambiguities and draw all permissible inferences in favor of the party against whom summary judgment is sought."   *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003); *Duse v. International Business Machines Corp.*, 252 F.3d 151, 158 (2d Cir. 2001) (citing, *e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013).   Although the district court must view the evidence in favor of the nonmoving party, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'"   *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Anderson*, 477 U.S. at 252) (internal alterations and emphasis omitted).   Reliance by the nonmoving party on "conclusory allegations or unsubstantiated speculation" is insufficient to defeat a motion for summary judgment.   *Id.* at 554 (quoting *Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).   Summary judgment is appropriate "[w]here the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   Thus, the court's function in deciding a summary judgment motion is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."   *Anderson*, 477 U.S. at 249.

### C. Federal Statutory Framework

Title XIX of the Social Security Act, known as Medicaid, is a jointly financed federal-state program designed to provide medical care, services and supplies for the financially needy.   42 U.S.C. § 1396; *see Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990); *Wisconsin Dep't of*

*Health & Family Servs. v. Blumer*, 534 U.S. 473, 479 (2002).   The Secretary of Health and

Human Services ("HHS") exercises the authority entrusted to him by Congress for administering

Medicaid through the Centers for Medicare and Medicaid Services ("CMS").   *See Sai Kwan*

*Wong v. Doar*, 571 F.3d 247, 250 (2d Cir. 2009) (citations omitted).   CMS establishes federal

policy concerning the Medicaid program and oversees administration of Medicaid by the states.

As a participating state, New York must comply with certain requirements of the Medicaid Act

and its implementing regulations, including, the submission for approval to the Secretary of

Health and Human Services ("HHS") a "State plan" for granting assistance.[10]   *See* 42 U.S.C. §

1396a(a); *Sai Kwan Wong v. Doar*, 571 F.3d at 251 (citations omitted).   HHS has delegated

authority to approve State plans and plan amendments to the CMS Regional Administrators, 42

C.F.R. § 430.15(b),  and "as provided in regulations, 'CMS regional staff reviews State plans and

plan amendments, discusses any issues with the Medicaid agency, and consults with central

office staff on questions regarding application of Federal policy.' 42 C.F.R. § 430.14 (2002)."

*Community Health Center v. Wilson-Coker*, 311 F.3d 132, 134, 138 (2d Cir. 2002).

    In addition to meeting numerous other requirements, a State plan must include reasonable

standards for determining eligibility for and the extent of Medicaid assistance based upon the

availability of an applicant's income and resources, "as determined in accordance with standards

prescribed by the Secretary."   42 U.S.C. § 1396a(a)(17)(B).   The State plan must also comply

with the provisions of 42 U.S.C. § 1396p "with respect to liens, adjustments and recoveries of

medical assistance correctly paid,,[11] transfers of assets, and treatment of certain trusts."   42

U.S.C. § 1396a(a)(18).   Medicaid benefits provide medical assistance to cover nursing home

expenses for those needy individuals "whose income and resources are insufficient to meet the

---

[10] In New York, the DOH administers the Medicaid program, and at the local level, OCDSS is responsible for addressing the nursing facility services needs of individuals, such as Plaintiffs herein.   *See* 42 U.S.C. § 1396a(a)(1),(5); 42 C.F.R. § 431.10; N.Y. Soc. Serv. L. § 363-a(1); *Wojchowski v. Daines*, 498 F.3d 99, 102 (2d Cir. 2007).

[11] Punctuation included as originally set forth in the statute.

costs of necessary medical services." 42 U.S.C. § 1396-1. "Resources" are defined as any liquid or readily liquidated funds in the control of the applicant or anyone acting on the applicant's behalf. 18 N.Y.C.R.R. § 360-4.4.

When assessing financial eligibility and the availability of resources, federal law requires Medicaid administering agencies to determine whether an applicant for nursing facility services has transferred or disposed of assets for less than fair market on or after the statutory look-back period of 60 months, if made after February 8, 2006,[12] and if so, specifies a specific transfer penalty period. *See* 42 U.S.C. § 1396p(c). The pertinent subdivisions of 42 U. S.C. § 1396p(c), respectively, provide:

> § 1396p(c)(1)(A): In order to meet the requirements of this subsection for purposes of section 1396a(a)(18) of this title, the State Plan must provide that if an institutionalized individual or spouse ...disposes of assets for less than fair market value on or after the look-back date specified in subparagraph (B)(i), the individual is ineligible for medical assistance for services described in subparagraph (C)(i) ... during the period beginning on the date specified in subparagraph (D) and equal to the number of months specified in subparagraph (E).

> § 1396p(c)(1)(B)(i): The look-back date specified in this subparagraph is the date ...in the case of any other disposal of assets made on or after February 8, 2006, 60 months before the dates specified in clause (ii).

> § 1396p(c)(1)(B)(ii): The date specified in this clause, with respect to—(I) an institutionalized individual is the first date as of which the individual is both an institutionalized individual and has applied for medical assistance under the State plan.

> § 1396p(c)(1)(C)(i): The services described in this subparagraph with respect to an institutionalized individual are the following (I) Nursing facility services.

> § 1396p(c)(1)(D)(ii): In the case of a transfer of asset made on or after February 8, 2006, the date specified in this subparagraph is the first day of a month during or after which assets have been transferred for less than fair market value, or the date on which the individual is eligible for medical assistance under the State plan and

---

[12] According to the DOH Defendant, the Deficit Reduction Act of 2005 ("DRA") (Pub. L. No. 109-171) "amended the Medicaid transfer-of asset provisions to discourage the practice of individuals from transferring away approximately one half of their resources and using the retained resources to pay [for] nursing home care during the Medicaid penalty period...[and] addressed this planning strategy by requiring that a Medicaid penalty period cannot run until the person is otherwise eligible for Medicaid but for the prohibited transfer, i.e., not until retained resources have been spent down." Def. DOH's Mem. 3, ECF No. 14.

would otherwise be receiving institutional level care described in subparagraph (C) based on an approved application for such care but for the application of the penalty period, whichever is later, and does not occur during any other period of ineligibility under this subsection.[13]

Additionally, pursuant to 42 U. S.C. § 1396p(c)(1)(A) and § 1396(c)(1)(E)(i), with respect to an institutionalized individual, an administering agency must compute the number of months of ineligibility by dividing "the total, cumulative uncompensated value of all assets transferred by the individual …on or after the look-back date specified in subparagraph (B)(i)," "by the average monthly cost to a private patient of nursing facility services in the State (or, at the option of the State, in the community in which the individual is institutionalized) at the time of the application."

### D.  Federal Administrative Guidance

The CMS State Medicaid Manual in § 3258.10(c)(3) provides, in relevant part, for:

> All Assets Transferred for Less than Fair Market Value Are Returned to the Individual.---When all assets transferred are returned to the individual, no penalty period for transferring assets can be assessed.  In this situation, you must ensure that any benefits due on behalf of the individual are, in fact, paid.  When a penalty has been assessed and payment for services denied, a return of the assets requires a retroactive adjustment, including erasure of the penalty, back to the beginning of the penalty period.

> However, such an adjustment does not necessarily mean that benefits must be paid on behalf of the individual.  Return of the assets in question leaves the individual with assets which must be counted in determining eligibility during the retroactive period.  Counting those assets as available may result in the individual being ineligible for Medicaid for some or all of the retroactive period, (because of excess income/resources) as well as for a period of time after the assets are returned.

---

[13] In like manner as 42 U.S.C. § 1396p(c)(1)(D)(ii), AD 06 OMM/ADM-5, pp. 15-16 sets the date for commencement of a penalty period after discovery of under market transfers as "the first day of the month after which assets have been transferred for less than market value, or the first day of the month the otherwise eligible institutionalized individual is receiving nursing facility services for which Medicaid would be available but for the transfer penalty, whichever is later." Def. Tiberio's Mem. 3, ECF No. 13; Mangiarella Aff., Ex. 4, ECF No. 13-2.

### E.  DOH's Administrative Directive 06 OMM/ADM-5, pp. 18-19

DOH's AD 06 OMM/ADM-5, pp. 18-19, the policy at issue here, governs situations where all or parts of assets transferred for less than market value during the pertinent look-back period have been returned, and the penalty period of ineligibility for Medicaid nursing home coverage is recalculated based upon the net amount of gifts after the partial return of such assets. It provides, as follows, for all active Medicaid cases:

> [I]f all or parts of the transferred assets are returned after the Medicaid eligibility determination, **the assets must be counted in recalculating the individual's eligibility as though the returned assets were never transferred, and the length of the penalty period must be adjusted accordingly.** The recalculated penalty period, if any, will begin when the individual is receiving nursing facility services for which Medicaid coverage would be available but for the imposition of the transfer penalty. **Therefore, the recalculated penalty period cannot begin before the assets retained by the individual at the time of transfer, combined with the assets transferred and subsequently returned to the individual, have been spent down to the applicable Medicaid resource level.** (Emphasis added).

AD 06 OMM/ADM-5, pp.18-19.

### F.  Analysis of Pending Summary Judgment Motions

Plaintiffs' challenge to the emphasized portions of AD 06 OMM/ADM-5, pp.18-19 and, based on such policy, the decisions by the local DSS to recalculate their penalty start dates is premised on alleged misinterpretation of and direct conflict with federal Medicaid law requirements and CMS guidance. All parties agree that the penalty period, pursuant to 42 U.S.C. § 1396p(c)(1)(D)(ii), cannot begin until an institutionalized individual becomes Medicaid-eligible. Plaintiffs and Defendants interpret differently the language: **the penalty period begins only after the applicant becomes otherwise eligible for Medicaid**. The point at which their interpretations diverge is the meaning of the phrase "*otherwise eligible for Medicaid*" and when the period of eligibility begins for purposes of assessing the penalty periods for transfers of assets for less than fair market value following the partial return of these assets.

Using Plaintiffs' interpretation, the initial penalty start date could not be altered, since that was the date of initial eligibility determination, "*but for application of the penalty period.*" In Plaintiffs' view, they were "*otherwise eligible for Medicaid*" on the date of the initial eligibility determination, "but for application of the penalty period." Thus, partial returns of assets after the date of initial eligibility determination, *i.e.*, November 1, 2007 for Plaintiff Aplin and January 1, 2010 for Plaintiff Ciardi, should not affect the running of the penalty period or effect a different penalty start date, because (1) CMS guidance provides that "Once the penalty period is imposed, it will not be tolled (i.e., will not be interrupted or temporarily suspended), but will continue to run even if the individual subsequently stops receiving institutional level care," citing CMS State Medicaid Director Letter SMDL #06-018 dated July 27, 2006, Enclosure (available on the CMS website, cms.gov), concerning the "New Medicaid Transfer of Asset Rules under the Deficit Reduction Act of 2005"; (2) § 3258.10(c)(3),[14] a provision of the CMS Medicaid Manual, a policy compendium binding on State Medicaid programs, provides that "When a penalty has been assessed…a return of the assets requires a retroactive adjustment, including erasure of the penalty, *back to the beginning of the penalty period…*" (emphasis supplied by Plaintiffs); and (3) 42 U.S.C. § 1396a(a)(10)(C)(i)(III)[15] and 1396a(r)(2)(B)[16] require State Medicaid programs to

---

[14] Confusingly, between themselves, Plaintiffs differ as to the significance of § 3258.10(c)(3). Plaintiff Ciardi relies on it as buttressing their interpretation (Pl. Ciardi Mem. 6, ECF No. 8-2), yet Plaintiff Aplin both believes that it buttresses their interpretation (Pl. Aplin Mem. 7, ECF No. 18-3) *and* based on the McCreal letter, that it is outdated and should not be followed (Pl. Aplin Mem. 2-3, ECF No. 25).

[15] 42 U.S.C. § 1396a(a)(10)(C)(i)(III) provides:

> "A State plan for medical assistance must—provide—that if medical assistance is included for any group of individuals described in section 1396d(a) of this title who are not described in subparagraph (A) or (E), then—the plan must include a description of the single standard to be employed in determining income and resource eligibility for all such groups, and the methodology to be employed in determining such eligibility, which shall be no more restrictive than the methodology which would be employed under the supplemental security income program in the case of groups consisting of aged, blind, or disabled individuals in a State in which such program is in effect, and which shall be no more restrictive than the methodology which would be employed under the appropriate State plan (described in subparagraph (A)(i) to which such group is more closely categorically related in the case of other groups."

[16] 42 U.S.C. § 1396a(r) (Disregarding payments for certain medical expenses by institutionalized individuals) provides in subparagraph (2)(B):

use methodologies for evaluating resources that are no more restrictive than those used by the Supplemental Security Income ("SSI") program policy as set forth in 42 U.S.C. §§ 1396a(a)(10)(C)(i)(III) and 1396a(r)(2)(B).

Primarily, though, Plaintiffs rely on the McGreal letter to which they argue this Court must respectfully defer. Plaintiffs vigorously argue that AD 06 OMM/ADM-5, pp. 18-19, upon which the local DSS determinations and/or the Fair Hearing Decision rested, conflicts with CMS policy as articulated in the McGreal letter dated October 28, 2010, which provided "informal written interpretive guidance" to Connecticut's Starkowski because certain proposed Department of Social Services regulations had been rejected by the General Assembly's Legislative Regulation Review Committee ("LRRC") as being in violation of Federal Law.

Upon conducting his review of Connecticut's proposed regulation and the LRRC's assessment, McGreal specifically noted that (1) the State's proposed regulation was based **in part** upon CMS State Medicaid Manual (SMM) § 3258.10, which pre-dated the Deficit Reduction Act of 2005 (DRA) (Public Law 109-171, February 8, 2006), and which permitted "a penalty period to run out prior to applying for Medicaid"; (2) the pre-DRA penalty period typically began at the date of transfer, under § 1917(c)(1)(D); and (3) the start date did not take into account whether the individual was receiving long-term care services, or was even eligible for Medicaid services at the time of the transfer.

The McGreal letter went on to state:

> The [Deficit Reduction Act (the "DRA")] did not address the issue of availability of the returned funds. The DRA adjusted the start date of the penalty period, not the start date of Medicaid eligibility. *It would be inappropriate to read these older [State Medicaid Manual] provisions in combination with the DRA in such a way that the State would have the option of starting a new, later penalty period based on an adjustment to the individual's eligibility determination.*

---

"For purposes of this subsection and subsection (a)(10) of this section, methodology is considered to be 'no more restrictive' if, using the methodology, additional individuals may be eligible for medical assistance and no individuals who are otherwise eligible are made ineligible for such assistance."

A significant problem with the State's proposed approach is the treatment of the returned partial assets as available to the individual from the date of transfer to the date of return, and potentially to a later date when a non-disqualifying disposition occurs. This appears to result in the start of a new, later penalty period. *A State is allowed to adjust the original penalty period in response to a partial return of assets, but is not allowed to adjust the individual's eligibility, thereby nullifying the original penalty period and beginning a new, later penalty period.* (Emphasis supplied by Plaintiff).

Plaintiffs take the position that this language, representing the "informed and elaborated views of CMS, is entitled to respectful deference." *See, e.g., Lopes v. Dep't of Social Services*, 696 F.3d 180, 187-88, n.4 (2d Cir. 2012).[17]

According to Defendants, AD 06 OMM/ADM-5, pp.18-19 was put into place to implement federal Medicaid law and, most particularly, in response to the 2005 DRA. Utilizing Defendants' interpretation of the same language in 42 U.S.C. § 1396p(c)(1)(D)(ii), upon the partial return of assets, neither Plaintiff would become "*otherwise eligible for Medicaid*" nursing home benefits until she/he spent down the partially returned assets or excess resources to the New York State Medicaid resource level of $14,400 by offsetting any nursing home bills, which by DOH policy is permissible from the date of the initial eligibility determination. Only when Plaintiffs were genuinely eligible, could a new eligibility date be set and begin the recalculated penalty period.[18]

Defendants also contend that the original penalty period was interrupted only by each Plaintiff's request for a recalculated penalty period due to the partial return of assets transferred

---

[17] Rene Reixach, Esq., Plaintiffs' attorney, represented Plaintiff-Appellee Lopes in *Lopes v. Dept of Social Services*, 696 F.3d 180 (2d Cir. 2012). There, the Second Circuit solicited input from U.S. Department of Health and Human Services ("HHS") to assist in the determination as to whether the payment stream from a non-assignable annuity of a community spouse must be considered a resource for purposes of Medicaid eligibility of the institutionalized spouse; HHS weighed in on the side of Plaintiff-Appellee Lopes, and the Court in n.4 referred to the State Commissioner's acknowledgment that "the secretary [of HHS]'s guidance is essentially controlling."

[18] Per the Brennan Aff. ¶ 1: "In redetermining an institutionalized individual's Medical Assistance (Medicaid) eligibility for nursing home care, DOH allows the institutionalized individual to use partially returned assets to pay his/her nursing home bill beginning with the start of the original penalty period instead of considering the institutionalized individual prospectively ineligible for Medicaid by reason of the partially returned asset." ECF No. 14-1. Plaintiff Ciardi argues that the Brennan Affidavit restates an obviously recognized policy for treatment of partially returned assets and adds nothing new to the discussion. ECF No. 17.

for less than market value.   Additionally, the fact remained that some of the previously transferred assets were returned to Plaintiffs during a period of _ineligibility_, and such amounts exceeded the maximum Medicaid resource level of $14,400,[19] thereby continuing to render them ineligible for coverage by Medicaid of nursing home services until such excess resources had been spent down.   Hence, the return of assets triggered the application of the spend-down provisions.   Undeniable authority for the DOH policy permitting spend down of excess resources by offsetting medical bills in New York, is supplied by Plaintiffs themselves, the decision in _Westmiller by Hubbard v. Sullivan_, 729 F. Supp. 260 (W.D.N.Y. 1990) (ECF. No. 8-2).[20]

Arguing the incompleteness of Plaintiffs' citation of § 3258.10(c)(3) of the State Medicaid Manual, Defendants point out that the very next paragraph fails to support Plaintiffs' interpretation and makes clear that the return of assets does not necessarily render an individual eligible for medical assistance, because "[c]ounting those assets as available may result in the individual being ineligible for Medicaid for some or all of the retroactive period, (because of excess income/resources) as well as for a period of time after the assets are returned."   Moreover, they state, contrary to Plaintiffs' interpretation, the rules governing the methodology for determining available resources of applicants for nursing home services are no more restrictive than those governing SSI requirements.

Defendants also assert that Plaintiffs have mistaken both the meaning and impact of the McGreal October 2010 "informal written interpretive guidance" letter, which, they argue, does not have force and effect of law.   They also direct the Court's attention to two New Jersey cases,

---

[19] Even considering the Leaf Affidavit supplied by Plaintiff Ciardi and resolving any ambiguity in the information contained therein and in the attached chart, it is clear that all the money gifted back and credited by OCDSS was used to pay his nursing home expenses.  Of the $167,147.21 returned, $161,647.21 came from Plaintiff Ciardi's own trust with the balance from Carl Quance.

[20] Interestingly, the ability to use these excess resources to pay nursing home bills in order to spend down to the Medicaid resource level was secured in _Westmiller_ by plaintiffs represented therein by present counsel for Plaintiffs Aplin and Ciardi.

*Marino v. Velez*, 406 F. App'x 651, 653 (3d Cir. 2011)[21] and *S.S. v. Division of Medical Assistance and Health Services, New Jersey Dept. of Human Services*, 2011 WL 1584419, at *2 (N.J. Super. Ct. App. Div. April 28, 2011), as supporting their interpretation of 42 U.S.C. § 1396p(c)(1)(D)(ii).

Turning to the argument most critical to Plaintiffs' position, from their perspective, I find that aside from making clear that the DRA did not address the issue of availability of the returned funds, the McGreal letter offers little clarity on the question before me.  First, I disagree with Plaintiffs' conclusory pronouncements that the Connecticut regulations referred to therein mirrored AD 06 OMM/ADM-5, pp.18-19 because strikingly absent from McGreal's letter is any reference to the specific language of the regulations rejected by the LRRC.  As such, there is no evidence from which to conclude the existence of the claimed similarities between the rejected Connecticut regulations and AD 06 OMM/ADM-5, pp. 18-19.  Meaningful comparison of the language of these provisions is thereby fatally unavailing.

Moreover, unlike in *Lopes*, here, there has been no showing that the "informal, written interpretive guidance" in the McGreal letter is controlling in that it represents an official statement of the CMS or has been adopted by the Secretary of HHS or incorporated into federal Medicaid statutes or regulations, giving it authoritative weight or enforceability.  *See Estate of Landers v. Leavitt*, 545 F.3d 98, 110 (2d Cir. 2008); *See Elgin Nursing & Rehab. Center v. U.S. Dep't of Health & Human Servs.*, 718 F. 3d 488, 492-494 (5th Cir. 2013) (deferring to "interpretations of interpretations" is unacceptable); *See Kai v. Ross*, 336 F.3d 650, 655 (8th Cir. 2003) ("[t]he letter is not a regulation of the Department of Health and Human Services, nor is it part of generally published advice, for example a practice manual distributed nationwide.  It is simply a letter from the Associate Administrator of the region of the Health Care Financing Administration of which of which Nebraska is a part.").  Although the fact of the HHS/CMS

---

[21] Plaintiff Marino's attorneys included Rene Reixach, Esq. who represents Plaintiffs Aplin and Ciardi.

approval of the New York State plan is not, in and of itself, determinative of the instant question, Plaintiffs have not submitted any evidence that since approving New York's procedures for determining the date from which a penalty period begins to run, the Secretary has taken issue with such procedures.[22]

Significantly, it does appear from a fair reading of an attachment to the Thorsness Affidavit (ECF No. 13-1, Ex. 3), a document admittedly obtained on the internet, that the "informal, written interpretive guidance" provided by McGreal in his October 28, 2010 letter proved to be less than clear to Connecticut Department of Social Services officials grappling with the issue of eligibility and returns of assets transferred for less than fair market value.   Assuming for argument's sake, the authenticity of this document, less than two months later, on December 16, 2010, McGreal, again, wrote in response to the requests of Connecticut Department of Social Services officials to clarify Connecticut's "application of a penalty period for a disqualifying transfer of assets pursuant to § 1917(c) of the Social Security Act, specifically the requirement, "under the State Medicaid Manual § 3528.10, for the purpose of determining eligibility, to count those fully returned assets as having been available to the individual from the date of transfer and not from the date of return." *Id.* (Emphasis added.)

In this second letter, McGreal reiterates his earlier-stated position that the DRA (1) "postponed the start date of the penalty period from the date of transfer to a later date when the individual would both be receiving long-term care and have become eligible for Medicaid, but for the imposition of the penalty period," and (2) "did not address the issue of the availability of the returned funds." McGreal goes on to state:

> CMS has not developed any formal guidance on this issue post-DRA.   In the absence of formal CMS guidance a State may adopt any reasonable methodology

---

[22] Indeed, I have reviewed the Nelson A. Rockefeller Institute of Government, Medicaid and Long-term Care: New York Compared to 18 Other States, Feb. 2009, pp. 12-14, and find that it shows the Secretary officially approved the New York State plan regarding assessing penalty periods as a result of less than fair market value transfers by Medicaid recipients during the look-back period. Def. Tiberio's Mem., 6, ECF No. 20-1.

for considering the availability of returned assets for the purposes of Medicaid eligibility. We do believe that the State is not required to count the fully returned assets as having been available to the individual from the date of transfer. Section 3528.10 provided for the erasure of a penalty period under pre-DRA rules when penalties began at the time of transfer. Such is no longer the case under the DRA.

*Id.*

According a modicum of respectful consideration to the earlier McGreal letter, I find it leaves no doubt that the CMS has not provided any formal guidance on the treatment of partial returns of assets transferred for less than market value for purposes of Medicaid eligibility and lends credence to the Defendants' position that the NYSDOH's promulgation of AD 06 OMM/ADM-5, pp. 18-19 and its application by WCDSS and OCDSS, reasonably comported with and was consistent with the 2005 DRA. In view of what appears to be an unequivocal declaration in the latter McGreal letter, *i.e.*, "[i]n the absence of formal CMS guidance a State may adopt any reasonable methodology for considering the availability of returned assets for the purposes of Medicaid eligibility," a yawning weakness appears in Plaintiffs' arguments that nothing in CMS interpretations permits the penalty period start date to be moved in the manner utilized in the circumstances presented. *Id.*

I find significant, too, the absence of actual precedential authority interpreting Administrative Directive 06 OMM/ADM-5, pp. 18-19 in the manner advocated by Plaintiffs in the intervening years since the Administrative Directive became effective. No party has cited any Second Circuit cases which address the exact question at issue here and, after a diligent search, I have not become aware of any.

While Plaintiffs strenuously protest consideration of the New Jersey court cases cited by Defendants, I, nonetheless, find the reasoning therein persuasive. In *Marino v. Velez*, 406 F. App'x 651, 653, the Third Circuit Court affirmed the denial of a preliminary injunction in *Marino v. Velez*, 2010 U.S. Dist. Lexis 43950 (D.N.J. May 4, 2010), which involved a dispute over the date of imposition of a penalty period for Medicaid benefits after a partial return of assets transferred for less than market value. Adversely determining Mrs. Marino's claim that

because she was eligible for Medicaid benefits when she initially applied for Medicaid, her original penalty period had been improperly tolled following the partial return of $89,000 in assets, the New Jersey District Court ruled that the defendants properly followed the procedural time frames established in 42 U.S.C. § 1396p(c)(1)(D)(ii), stating, "[t]herefore, because Plaintiff was not deemed eligible for Medicaid benefits until April 1, 2010 (the time period she used to spend down the funds from her returned gifts), her penalty period from her transfers does not begin to run until eligibility in accordance with 42 U.S.C. § 1396p(c)(1)(D)(ii)." *Id.* Furthermore, not impressed with Mrs. Marino's argument that a penalty period cannot be "tolled (i.e., will not be interrupted or temporarily suspended)," the district court went on to declare that "there is simply no tolling since the penalty period was never triggered due to Plaintiff's ineligibility." *Id.*

In *S.S. v. Division of Medical Assistance and Health Services, New Jersey Dept. of Human Services*, 2011 WL 1584419, the Superior Court of New Jersey, Appellate Division, rejected a claim by S.S., an elderly nursing home resident, that notwithstanding the transfer of assets for less than market value to her son,[23] she became financially eligible for Medicaid benefits on September 1, 2008, the date on which her resources purported fell below the level required to establish Medicaid eligibility and the assessed transfer penalty period should have run from that date instead of March 1, 2009, the date the Administrative Law Judge and the Director of the Division of Medical Assistance and Health Services, New Jersey Department of Human Services found that she met all of the requirements of Medicaid eligibility pursuant to 42 U.S.C. § 1396(c)(1)(D)(ii).   The New Jersey appellate court concluded that the result sought by S.S. would be contrary to federal law governing the State's Medicaid program because S.S. was not genuinely eligible for Medicaid on September 1, 2008, *i.e.*, "[h]er 'eligibility' on that date was a

---

[23] Mrs. Marino transferred $76,570.40 of her assets to her son who applied $42,909.75 of that amount towards the cost of her nursing home care from September 2008 through February 2009.

'false eligibility,' since it was created by the transfer of assets for less than market value," and moreover, would improperly allow her to protect some of the assets transferred to her son.  *Id.*

Read together, the above analysis and reasoning utilized by the New Jersey courts provide a convincing basis for concluding that AD 06 OMM/ADM-5, pp. 18-19 does not conflict with federal Medicaid law.  I find no circumstances in this case which indicate that Defendants' interpretation and application of the provisions of DOH's Administrative Directive contravene Congress' articulated purpose in enacting the Medicaid Act — to provide medical care, services and supplies for the financially needy.  Essentially, the assessment of an applicant's income and resources which results in a determination that such applicant has transferred resources for less than fair market value during the statutory look-back period and that an appropriate penalty period must be imposed, ensures that the applicant has not falsely impoverished himself or herself in order to qualify for medical assistance at public expense which, by law, is undeserved. *See Marino v. Velez*, 406 F. App'x at 653.   Plaintiffs, as did Mrs. Marino and S.S., planned for Medicaid coverage of their nursing home care outside the bounds of the applicable statutory provisions.

### 1.  Liability of County Defendants under § 1983

42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State …subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ….

Pointing to the fact that she is mentioned in the Ciardi Complaint only in ¶ 4, where it is alleged that she is the "Commissioner of the DSS," and nowhere therein is it alleged that she was **personally involved** in any allegedly improper actions, or created or has the authority to change the policy which Plaintiff Ciardi disputes, Defendant Tiberio asserts that she cannot be held

liable under § 1983 in view of the U.S. Supreme Court's rejection of the notion that "a supervisor's mere knowledge" of her subordinate's conduct amounts to a violation of § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable in § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution.)"; *see Monell v. Dep't of Social Servs. of New York City*, 436 U.S. 658, 691 (1978) (municipal liability cannot be established solely on the basis of *respondeat superior*).   Additionally, the Second Circuit has adopted the view that "*Monell*'s bar on *respondeat superior* liability under § 1983 applies regardless of the category of relief sought," *i.e.*, in "suits seeking monetary, declaratory or injunctive relief" based on misconduct pursuant to a municipal policy or custom.   *Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007).

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted).   Personal involvement of a supervisory defendant may be demonstrated by evidence of such defendant's: (1) direct participation in the alleged constitutional violation; (2) failure to remedy the wrong after being informed of the violation through a report or an appeal; (3) creation of a policy or custom under which unconstitutional practices occurred or were permitted to continue; (4) gross negligence in supervising the subordinates who committed wrongful acts; or (5) deliberate indifference to rights by failing to act on information indicating that unconstitutional acts were occurring.[24] *Id.* at 139 (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *see Williams v. Smith*, 781 F.2d 319, 323-24 (2d

---

[24]*Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. 2013) cited all five factors set out in *Colon v. Coughlin*, 58 F.3d at 873 and, further, referenced the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), indicating that *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain violations."   The Second Circuit was not presented with proper facts in *Grullon* to rule on *Iqbal*'s significance and has not explicitly recognized the split among the district courts over whether all five of the *Colon* factors are still applicable.

Cir. 1986).   Absent one or more of these factors, the mere fact of supervisory authority is insufficient to demonstrate liability under § 1983.   Even viewing the instant allegations favorably under an analysis of the *Colon* criteria, Plaintiff Ciardi has failed to establish that in the exercise of her supervisory function Defendant Tiberio was personally involved.

In any event, as Defendants Tiberio and McCrossen were sued only in their official capacities, and in these official capacity lawsuits, Ontario County and Wayne County are the real parties in interest.   *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).   Cities and counties may be sued under § 1983.   *Monell* at 690.   Local government officials sued in their official capacities are "persons" under § 1983 in those cases in which a local government would be suable in its own name," *Id.* at 691, n.54, *i.e.*, not on the sole basis of *respondeat superior*, but "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694.   Only then, can it said that the local government as an entity is responsible under § 1983. *Id.*   No question, the execution of AD 06 OMM/ADM-5, pp. 18-19, as promulgated by DOH, was mandatory upon WCDSS and OCDSS in making eligibility determinations for nursing home assistance.   42 U.S.C. § 1396a(a)(1).

### 2.  Entitlement of County Defendants to Qualified Immunity

It is well settled that "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,'" and is available only in individual capacity suits.   *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982)).   Thus, as Plaintiffs aptly maintain, any claims of entitlement to qualified immunity are irrelevant in this lawsuit because Defendants Tiberio and McCrossen were sued in their official capacities only.

### 3. State Officials and Eleventh Amendment Immunity

As a matter of statutory construction, States, State agencies, and State officials sued in their official capacities are not "persons" subject to suit pursuant to § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather against the official's office" ...and is no different from a suit against the State itself."). State officials who are sued in their official capacities enjoy Eleventh Amendment immunity as the State does. *Conrad v. Perales*, 92 F. Supp. 2d 175, 179 (W.D.N.Y. 2000).

Plaintiffs forthrightly have acknowledged that the DOH and OTDA Defendants were sued in their official capacity,[25] and that suit for damages and relief is barred by the Eleventh Amendment, which bar "by definition applies only to official capacity suits." *Yorktown Medical Lab., Inc. v. Perales*, 948 F.2d 84, 87 (2d Cir. 1991) ("Official capacity suits seek, in all aspects other than the party named as defendant, to impose liability on the government.") (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (a claim for damages against state officials in their official capacity is considered as a claim against the state and therefore barred by the Eleventh Amendment)); *see Shabazz v. Coughlin*, 852 F.2d 697, 700 (2d Cir. 1988).

It is well-settled that the Eleventh Amendment bars "suit[s] by private parties seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).[26] Furthermore, the Eleventh Amendment protects a state, its agencies and officials acting in their official capacities from suits in federal court for damages for past wrongs. *Conrad v. Perales*, 92 F. Supp. 2d at 179 (quoting *Tekkno Laboratories, Inc. v. Perales*, 933 F.2d 1093, 1097 (2d Cir. 1991) (citing, *e.g.*, *Edelman*)).

---

[25] The Eleventh Amendment does not bar an award of monetary damages for past violations against a State official sued in his or her individual capacity. *Hafer v. Melo*, 502 U.S. 21, 27-31 (1991).

[26] However, certain monetary awards that are ancillary to a grant of prospective relief are not prohibited by the Eleventh Amendment. *Id.* at 667-68; *see New York Cty Health & Hosps .Corp. v. Perales* 50 F.3d 129, 135 (2d Cir. 1995).

Although the literal reading of the Eleventh Amendment would seem to bar all relief against State officials sued in their official capacities, the doctrine announced in the landmark case of *Ex parte Young*, 209 U.S. 123, 155-156, 159 (1908) permits suits against officials in their official capacities for prospective injunctive relief to stop an ongoing violation of federal law. *See Verizon Maryland, Inc. v. Public Serv. Comm'n of Maryland*, 535 U.S. 635 (2002) (A federal court may require a State official to conform his or her future conduct to federal law where the alleged violation is ongoing and the relief sought is properly characterized as prospective.). The *Ex parte Young* exception does not authorize retroactive relief in the form of monetary awards. *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 98 (1984). The Eleventh Amendment also bars a federal court from issuing a declaratory judgment when there is no ongoing or threatened violation of federal law, but only a dispute about past actions. *Green v. Mansour*, 474 U.S. 64 (1985). As earlier discussed, the Court has determined that no violation of the federal Medicaid law provisions cited by Plaintiffs occurred in the application of AD 06 OMM/ADM-5, pp. 18-19. Consequently, all relief against the DOH and OTDA Defendants sued in their official capacity is barred.

4.  **Enforceability of 42 U.S.C. §§ 1396a(a)(18) and 1396p(c)(1)(A) and (D)(ii) and 42 U.S.C. § 1396a(a)(17)(B), through a Private Action under 42 U.S.C. § 1983**

Plaintiffs also contend that a private right of action exists under 42 U.S.C. § 1983 to enforce 42 U.S.C. §§ 1396a(a)(18) and 1396p(c)(1)(A) and (D)(ii). Not itself creating any substantive rights, § 1983 provides a means by which a person alleging a constitutional violation may bring a claim. (*Albright v. Oliver,* 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144, n.3, (1979)) (Section 1983, itself, is not "'a source of substantive rights,' but merely provides 'a method for vindication of federal rights elsewhere conferred.'"). That § 1983 safeguards certain rights conferred by federal statutes, as well the Constitution, is long settled. *Maine v. Thiboutot,* 448 U.S. 1 (1980).

Whether provisions of the Medicaid Act may be enforced under § 1983 is based upon the test

set forth in *Blessing v. Freestone*, 520 U.S. 329 (1997), which the Supreme Court later clarified

in *Gonzaga University v. Doe*, 536 U.S. 273 (2002).  The *Blessing* Court outlined a three-part

test for determining whether a statute confers a federal right: (1) Congress must have intended

that the provision in question benefit the plaintiff; (2) plaintiff must demonstrate that the right

asserted is not so "vague and amorphous" that its enforcement would strain judicial competence;

and (3) the statute must unambiguously impose a binding obligation on the States, that is, the

provision must be couched in "mandatory rather than precatory terms."  *Blessing*, 520 U.S. at

340-41.

Regarding the first element of this tripartite test, however, the Supreme Court in *Gonzaga*

removed any doubt that plaintiffs only had to fall within the general zone of interest that the

statute is intended to protect, stating:

> We now reject the notion that our cases permit anything short of an
> unambiguously conferred right to support a cause of action brought under § 1983.
> Section 1983 provides a remedy only for the deprivation of 'rights, privileges, or
> immunities secured by the Constitution and laws' of the United States.
> Accordingly, it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that
> may be enforced under the authority of that section.

*Gonzaga*, 536 U.S. at 283.  The key inquiry, then, is whether or not Congress intended to confer

individual rights upon a class of beneficiaries, by "explicit rights-creating terms" that are phrased

with unmistakable focus on the benefited class."  *Id.* at 284.  Moreover, the *Blessing* Court

declared further that a demonstrated individual right does not end the discussion because,

> Even if a plaintiff demonstrates that a federal statute creates an individual right,
> there is only a rebuttable presumption that the right is enforceable under § 1983.
> Because our inquiry focuses on congressional intent, dismissal is proper if
> Congress 'specifically foreclosed a remedy under § 1983.  (citation omitted).
> Congress may do so expressly, by forbidding recourse to § 1983 in the statute
> itself, or impliedly, by creating a comprehensive enforcement scheme that is
> incompatible with individual enforcement under § 1983.

*Blessing*, 520 U.S. at 341.

Here, Plaintiffs have cited several cases in which courts, applying the *Blessing* test, have held that relief is available under 42 U.S.C. § 1983 in actions alleging that state Medicaid officials have violated the requirements of 42 U.S.C. §§ 1396a(a)(18) and 1396p(c)(1) regarding the treatment of uncompensated transfers of assets. *See, e.g. Lewis v. Alexander*, 685 F.3d 325, 344-45 (3d Cir. 2012); *Dultz v. Velez*, 726 F. Supp. 2d 480, 489-90 (D.N.J. 2010). Defendants argue that instead of conferring individual rights upon a class of beneficiaries by "explicit rights-creating terms," the intent of 42 U.S.C. § 1396p(c) is to penalize individuals who seek to falsely impoverish themselves in order to be eligible for Medicaid benefits, thereby, precluding relief under 42 U.S.C. § 1983.

I find the *Blessing* test has been met with respect to 42 U.S.C. §§ 1396a(a)(18) and 1396p(c)(1) regarding the treatment of uncompensated transfers of assets. First, 42 U.S.C. § 1396a(a)(18) definitively states that "A State plan for medical assistance must comply with the provisions of section 1396p of this title with respect to …transfers of assets …." Thus, compliance with the federal transfer of assets statute is mandatory on the States and is enforceable under 42 U.S.C. § 1983. *See Johnson v. Guhl*, 91 F. Supp. 2d 754, 770 (D.N.J. 2000) (under the three factor analysis in *Blessing*, § 1396a(a)(18) also creates a federal right enforceable under § 1983).

Second, the *Dultz* Court, when explaining its conclusion that 1396p(c)(1) creates an individually enforceable right under 42 U.S.C. § 1983, stated it best:

> For one, the text clearly designated 'individuals' as the provision's beneficiaries by prescribing a time-limited penalty period after which the individuals are eligible for services….While the penalty period is punitive, which might suggest that the provision was designed to benefit the State by limiting eligibility, that Congress set forth detailed calculations as to the accrual and length of the period makes clear that Congress meant to protect those individuals who made uncompensated transfers from undue penalty by the State. Otherwise, Congress would have left the details to State discretion. Furthermore, the subsections setting forth the means by which the penalty period is calculated are meticulously detailed and specific, making it possible for courts to interpret and apply the penalty period without straining judicial resources. In addition, § 1396p(c)(1) uses mandatory versus precatory language, by providing that the State plan

"must" provide that an individual is ineligible 'during [a] period.'   This mandatory language dictates how the State is to assess a penalty against the individual.   Such individually-focused, mandatory language is 'right-creating.'

*Dultz v. Velez*, 726 F. Supp. 2d at 489-90 (internal citation omitted).   I concur in this reasoning.

Enforcement of this right would not strain judicial competence, notwithstanding the complexity of the Medicaid statute.   Apparently, the parties recognize that the Supreme Court has found little merit in the argument that "Congress has foreclosed enforcement of the Medicaid Act under § 1983." *See Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 520 (1990).   Thus, I find that 42 U.S.C. §§ 1396a(a)(18) and 1396p(c)(1), regarding the treatment of uncompensated transfers of assets, may create a private right of action under 42 U.S.C. § 1983.

However, the same cannot be said to be the case with respect to 42 U.S.C. § 1396a(a)(17). As Plaintiffs acknowledge, courts have held that 42 U.S.C. § 1396a(a)(17) is not enforceable under 42 U.S.C. § 1983. *See Lankford v. Sherman*, 451 F.3d 496, 509 (8th Cir. 2006) (Even assuming 42 U.S.C. § 1396a(a)(17) passed the first prong of the *Blessing* test, "the right it would create is too vague and amorphous for judicial enforcement.") (quoting *Watson v. Weeks*, 436 F.3d 1152, 1162 (9th Cir. 2006)).   No party has insinuated any contrary principle.

That 42 U.S.C. §§ 1396a(a)(18) and 1396p(c)(1) of the Medicaid Act may create an enforceable right for Plaintiffs under 42 U.S.C. § 1983, is a decidedly separate question from whether these Plaintiffs have demonstrated as a matter of law that this right was actually violated by these Defendants.   I find there is no demonstration that AD 06 OMM/ADM-5, pp. 18-19 is contrary to or violates federal laws governing Medicaid eligibility for nursing home care assistance in the circumstances presented, and Plaintiffs' right to recovery under 42 U.S.C § 1983 is precluded.

### 5.   Relief under the Supremacy Clause[27]

---

[27] Article VI, cl. 2 of the U.S. Constitution provides:

Plaintiffs assert an alternative basis for enforcing their claims under the federal statutes cited in the Complaint, stating, "[t]he whole issue of a claim under the Supremacy Clause need not be considered if the court agrees that [there is] a remedy under § 1983 based upon the alleged conflict between AD 06 OMM/ADM-5, pp. 18-19 and the federal Medicaid statute." Unquestionably, "the Supremacy Clause of its own force, does not create rights enforceable under § 1983 .... That clause is not a source of any federal rights; it secure[s] federal rights by according them priority whenever they come into conflict with state law." *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 107 (1989) (internal quotation marks and citation omitted). Here, the Court has determined that Plaintiffs' demonstration of a conflict between AD 06 OMM/ADM-5, pp. 18-19 and the federal Medicaid statute lacks meritorious support. Therefore, no analysis of whether relief is available under the Supremacy Clause is necessary.

### 6. Suit on Behalf of Others

I agree with Defendant Tiberio's assessment that to the extent which Plaintiff Ciardi requests a judgment broadly declaring the penalty provisions of AD 06 OMM/ADM-5 "illegal, null and void," such judgment far exceeds the allegations of the Complaint which are personal to his circumstances. He lacks standing to assert claims or seek relief on behalf of un-named plaintiffs.

### 7. Mootness

The Court's determination that no conflict exists between AD 06 OMM/ADM-5, pp. 18-19 and the federal Medicaid statute forecloses the granting of Plaintiffs' requests for injunctive and declaratory relief. In the absence of such conflict, any such request by Plaintiff Ciardi, in

---

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

particular, premised upon demonstrated harm and the likelihood of success on the merits, cannot be countenanced.  Furthermore, it would appear that both Plaintiffs now would be eligible for Medicaid coverage of their nursing home expenses.

## IV.    CONCLUSION

Resolving all ambiguities and drawing all permissible inferences in favor of Plaintiffs, as the Court is required to do, and in the absence of any disputed facts, I conclude that Plaintiffs are not entitled to judgment as a matter of law on the record taken as a whole.  I further conclude that judgment as a matter of law should be entered for Defendants.  I hereby direct the Clerk of the Court to dismiss the Complaints filed, respectively, in Case No. 12-CV-6312 and Case No. 13-CV-6388 and to close the cases.

Dated: August 25, 2014
           Rochester, New York

HON. FRANK P. GERACI, JR
United States  District Court Judge